J-S44044-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF:  M.S., a Minor | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  M.S., Father | No. 3456 EDA 2015 |

Appeal from the Decree entered October 14, 2015,
in the Court of Common Pleas of Philadelphia County,
Civil Division at No(s): 51-FN-389808-2009,
CP-51-AP-0000682-2014

| | |
|---|---|
| IN THE INTEREST OF: N.R.S., a Minor | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  M.S., Father | No. 3457 EDA 2015 |

Appeal from the Decree entered October 14, 2015,
in the Court of Common Pleas of Philadelphia County,
Civil Division at No(s): 51-FN-389808-2009,
CP-51-AP-0000683-2014

J-S44044-16

IN THE INTEREST OF: K.M.S., a Minor | IN THE SUPERIOR COURT OF PENNSYLVANIA

APPEAL OF: M.S., Father | No. 3458 EDA 2015

Appeal from the Decree entered October 14, 2015,
in the Court of Common Pleas of Philadelphia County,
Civil Division at No(s): 51-FN-389808-2009,
CP-51-AP-0000684-2014

BEFORE: FORD ELLIOTT, P.J.E., STABILE and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.: **FILED JUNE 08, 2016**

M.S. ("Father") appeals from the Decrees granting the Petitions filed by the Philadelphia County Department of Human Services ("DHS" or the "Agency") to involuntarily terminate his parental rights to his son, M.S. (born in December 2002), and daughters, N.R.S. (a/k/a N.S., born in August 2004), and K.M.S. (a/k/a K.S., born in October 2006) (collectively, "the Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[1] We affirm.

In its Opinion, the trial court set forth the relevant history of this case as follows:

> On September 10, 2013, DHS received a General Protective Services (GPS) report alleging that the family lacked appropriate and stable housing. Furthermore, the report alleged that

---

[1] The trial court's October 14, 2015 Decrees provide that Father's parental rights are terminated pursuant to section 2511(a)(1), (2), (5), (8), and (b), but the trial court Opinion, entered on January 20, 2016, states that Father's parental rights were terminated pursuant to subsection (a)(1), (2), (8), and (b). **See** Trial Court Opinion, 1/20/16, at 2-5 (unnumbered).

- 2 -

[F]ather was transient, unable to provide for the [C]hildren[,] and may abuse drugs and alcohol. The mother, [D.Z. ("Mother"),] died in 2012. The report also alleged that paternal aunt and uncle were willing to care for the [C]hildren[;] however, they needed financial support. The report was substantiated.

DHS subsequently learned that the [C]hildren all have a history of truancy.

On September 12, 2013, DHS obtained an Order of Protective Custody (OPC) for the [C]hildren and placed them in the care and custody of the paternal aunt and uncle[,] where [the Children] currently remain.

A shelter care hearing was held on September 13, 2013[,] before the Honorable Jonathan Q. Irvine. Judge Irvine adjudicated the [C]hildren dependent and committed them to the care and custody of DHS.

The matters were listed … before judges of the Philadelphia Court of Common Pleas -- Family Court Division -- Juvenile Branch pursuant to section 6351 of the Juvenile Act, 42 Pa.C.S.A. § 6351, and evaluated for the purpose of determining or reviewing the permanency plan of the [Children].

In subsequent hearings, the [Dependency Review Orders] DRO's reflect the [trial c]ourt's review and disposition as a result of evidence presented, primarily with the goal of finalizing the permanency plan.

On December 3, 2014, DHS filed termination [P]etitions.

Trial Court Opinion, 1/20/16, at 1-2 (unnumbered).

On October 14, 2015, the trial court held an evidentiary hearing on the termination Petitions. At the hearing, DHS presented the testimony of Harry Allen ("Mr. Allen"), the Director of Outpatient Services at Northeast Treatment Center ("NET"), as an expert in the area of child and adolescent

- 3 -

family treatment, via telephone. *See* N.T., 10/14/15, at 6-13. Mr. Allen is the therapist for the Children at NET. *Id.* at 13.

Mr. Allen testified that the Children were referred to the Community Umbrella Agency ("CUA"), *Associacion Puertorriquenos en Marcha* ("APM"), in December of 2013, and he provided direct treatment to them. *Id.* Mr. Allen stated that, in the therapy that he provides for the Children, he allows them to take the lead, as they have experienced traumatic issues. *Id.* at 13-14. The traumatic issues include exposure to violence; multiple moves and evictions, often without warning; the death of their Mother; insecure attachments with both parents; and learning to be hypervigilant for their own safety because of uncertainty about their future. *Id.* at 14.

Mr. Allen testified concerning a report that he prepared, dated September 24, 2014, in which he expressed concern that, in his two years of working with the Children, there had not been any change in Father. *Id.* at 14-15. Mr. Allen stated that Father's access to the Children has been progressively restricted because of Father's lack of follow-through. *Id.* at 15. Mr. Allen explained that, initially, Father had two-hour visits with the Children at APM and unlimited phone calls. *Id.* at 15-16. After Mr. Allen worked with the Children for three to six months, Father's phone calls became very erratic, and the roles reversed, such that the Children worried about Father. *Id.* at 16. At the next meeting regarding Father's Family Service Plan ("FSP"), Father was restricted to placing phone calls to the

Children at a specific time. *Id.* Father failed to make the calls. *Id.* When they did not hear from Father, the Children experienced anxiety that was difficult for them and their foster parents to manage. *Id.* At the next FSP meeting, Father's phone calls were eliminated, and his visits were restricted to one hour. *Id.* Mr. Allen's greatest concern is that there has been no change in Father's prognosis, and no change in Father's relationship with the Children. *Id.*

In January 2015, Mr. Allen advised Father that he should not promise the Children that they would be reunited at the next court date, as Father's false promises caused increased anxiety and behavioral issues for the Children. *Id.* at 17. Subsequently, the Children informed Mr. Allen that Father again promised them that they would be reunified at the next court hearing date, which increased their anxiety and worsened their behavior. *Id.* The following week, the Children reported to Mr. Allen that Father stated that they would be reunified not at the next court hearing date, but at the following hearing date. *Id.* at 17-18. Mr. Allen told Father that he could not work with Father, because Father did not comply with Mr. Allen's instruction not to make such promises. *Id.* at 18.

M.S. and N.S. are diagnosed with Post Traumatic Stress Disorder ("PTSD"). *Id.* K.S. is diagnosed with Generalized Anxiety Disorder. *Id.* Mr. Allen believes that Father is unable to care for the Children's needs and

provide a healthy structure for the Children, in consideration of their diagnoses. *Id.*

Mr. Allen recommended a decrease in the length of his visits with the Children, from two hours to one hour, because, while the Children were anxious to see Father, nothing occurred at the visits. *Id.* Mr. Allen met with Father twice. *Id.* at 19. Father did not reach out to Mr. Allen until the court hearing in December 2014, when the FSP first changed from reunification to adoption. *Id.* at 19-20. Mr. Allen testified that the Children's foster parents, their paternal aunt and uncle, are able to provide for the Children's specialized needs, and provide a healthy structure for the Children. *Id.* at 20. Mr. Allen has seen dramatic improvements in the Children's behavior and emotional health since they have resided with their foster parents. *Id.* He stated that, when the Children were placed with their foster parents and began treatment with him, they were not used to having structure. *Id.* at 20-21. Mr. Allen explained that the foster parents have worked with the Children to provide structure, which they previously had lacked because of multiple moves and evictions. *Id.*

Mr. Allen stated that the Children now take pride in their own well-being. *Id.* at 21. M.S. has shown Mr. Allen his summer reading list and awards he has won in baseball. *Id.* M.S. has made the honor roll in school on his own initiative. *Id.* Mr. Allen explained that the foster parents' expectation that the Children can be successful has fostered the Children's

confidence in their own success. *Id.* The Children appear to have a bond with their foster parents. *Id.* at 22.

On cross-examination by the child advocate, Mr. Allen stated that the Children had experienced thirteen evictions, attended five different schools, and were exposed to domestic violence between their parents and the parents' paramours. *Id.* N.S., who has PTSD, had a self-injurious behavior of biting herself when she first went into foster care. *Id.* at 22-23. The initial FSP plan provided that Father would not be included in the Children's therapy, but he would call them. *Id.* at 23. After the FSP plan was changed to adoption, Father requested family therapy, which was no longer an option. *Id.* at 23-24. Father minimized the Children's need for shelter and denied the impact/existence of his mood changes. *Id.* at 24. Father instructed the Children not to speak with Mr. Allen. *Id.* at 24-25. The Children exhibited anxiety and hesitation in speaking with Mr. Allen. *Id.* at 26.

When Mr. Allen first met with M.S., the child exhibited aggression toward his siblings, which does not continue today. *Id.* at 27. Mr. Allen attributes M.S.'s aggressive behavior to his biological parents, and attributes his improvement to therapy for PTSD. *Id.* at 27-28. Mr. Allen testified that M.S. is not on medication. *Id.* at 28. He further testified that the Children have learned coping skills to delay their "flight or fight" responses. *Id.* at 28. Mr. Allen opined that the Children look to their foster parents for

stability and love. *Id.* at 28. He believes that it would be in their best interests to remain with their foster parents, and for their foster parents to adopt them. *Id.* at 28-29.

On cross-examination by Father's counsel, Mr. Allen explained that his therapy approach is indirect, and that the Children drive the pace of the therapy. *Id.* at 29. Mr. Allen has observed the Children interact with their foster parents on a weekly basis, as the foster parents bring the Children to the therapy sessions, and sometimes are included in the therapy sessions. *Id.* at 29-30. Mr. Allen stated that the Children have positive interaction with their foster parents. *Id.* at 30. At first, the therapy focused on assisting the Children in connecting and feeling safe in the foster parents' home with the foster parents' two children. *Id.* At the time of the hearing, the therapy focused on maintaining the Children's momentum, as they have been outstanding students. *Id.* at 30-31. They excel in multiple activities, and they have formed age-typical relationships and friendships. *Id.* at 31.

Mr. Allen has not observed the Children interact with Father, as it is not within his role as their therapist. *Id.* He opined that family therapy with Father would not have benefitted the Children at the time of the change in the FSP goal to adoption. *Id.* at 31-32. While Mr. Allen believes that family therapy with Father would have been beneficial prior to the goal change, Father had to initiate such therapy, and he failed to do so. *Id.* at 32. Mr. Allen opined that the case was not appropriate for family therapy with

Father, because the foster parents were involved with the Children's therapy, not Father. *Id.* at 32-33.

Next, DHS presented the testimony of Alexander Pagan ("Mr. Pagan"), who is employed by APM and maintains the case record for the family. *Id.* at 34. Mr. Pagan testified that DHS became involved with the family because of the family's unstable housing and inability to care for the Children. *Id.* at 35. Mr. Pagan explained that DHS had concerns about drugs and alcohol in the family, and the Children's truancy. *Id.* at 35-36. Initially, Mr. Pagan called Father on the phone, and he had a Single Case Plan ("SCP") meeting with Father on July 13, 2013. *Id.* at 36. Father was also present at the SCP meetings on October 17, 2013, and March 28, 2014, and he was aware of his objectives. *Id.* at 37. Father's objectives were to attend the Achieving Reunification Center ("ARC") program, obtain employment, apply for housing, provide a housing lease to his CUA-APM worker, meet mental health objectives, and provide documentation of his employment. *Id.* at 37-38. The objectives have not changed.[2] *Id.* at 38.

Father was referred to ARC, but DHS and CUA did not provide assistance with his mental health objective. *Id.* Father did not complete any mental health program before DHS filed the termination Petitions on

_____

[2] Upon questioning by the trial court, Mr. Pagan clarified that, when the case first came to DHS, the Clinical Evaluation Unit ("CEU") determined that Father did not have to attend drug or alcohol treatment. *Id.* at 44. The Children were adjudicated dependent, and came into DHS care on September 30, 2013. *Id.*

December 3, 2014. *Id.* at 39. Father completed mental health treatment in 2015. *Id.* The status of Father's housing is unknown, as he has refused to provide Mr. Pagan with an address. *Id.* At the time of the hearing, Father had obtained employment. *Id.* at 40.

Father has one weekly, supervised visit with the Children between 4:00 p.m. and 5:00 p.m. *Id.* Between July 1, 2015, and October 14, 2015, Father missed four or five visits. *Id.* at 40-41. He sometimes leaves visits early and/or arrives late. *Id.* at 41. Father has never requested unsupervised visits with the Children. *Id.* Mr. Pagan has observed the visits, and noticed that Father will have sidebar conversations with other parents from the parenting class. *Id.* At times, Father engages with the Children, and there is conversation between the Children and him. *Id.* at 41-42. Father has not been involved with the Children's schooling. *Id.* at 42. Mr. Pagan attributes the Children's success in school to the foster parents. *Id.*

Mr. Pagan has observed the interactions between the Children and the foster parents as a loving, caring, bonded relationship. *Id.* M.S. looks to the foster parents for love, comfort, care, and support. *Id.* at 43. Mr. Pagan stated that the termination of Father's parental rights would not cause M.S. to suffer permanent emotional harm. *Id.* Mr. Pagan believes that the termination of Father's parental rights is in M.S.'s best interests, so that M.S. may be adopted by his foster parents. *Id.*

Mr. Pagan testified that N.S. has a positive, loving, caring, and bonded relationship with her foster parents. *Id.* at 44-45. N.S. looks to her foster parents as her primary caregivers. *Id.* at 45. Mr. Pagan stated that the termination of Father's parental rights would not cause N.S. to suffer permanent emotional harm. *Id.* Mr. Pagan believes that the termination of Father's parental rights is in N.S.'s best interests, so N.S. may be adopted by her foster parents. *Id.*

Likewise, Mr. Pagan testified that K.S. looks to her foster parents for love, comfort, care, and support. *Id.* at 45-47. Mr. Pagan stated that the termination of Father's parental rights will not cause K.S. to suffer permanent emotional harm. *Id.* Mr. Pagan opined that the termination of Father's parental rights is in K.S.'s best interests, so K.S. may be adopted by her foster parents. *Id.* When Mr. Pagan last saw the Children on September 28, 2015, they were safe, and their needs were being met. *Id.* at 46.

On cross-examination by the child advocate, Mr. Pagan clarified that the Children would not suffer irreparable harm upon the termination of Father's parental rights. *Id.* at 46-47. Father had been referred to ARC several times, and discharged several times, but only recently completed or attended some of the classes. *Id.* at 47. Father had recently attended, but not completed, a parenting class, did not have housing, and was discharged from ARC in June 2013, for failing to participate in a parenting class. *Id.* at

47-48. Although Mr. Pagan told Father that housing remained a goal, and explained why it was important for Father to show Mr. Pagan where he resides, Father refused to give Mr. Pagan his address. *Id.*

On cross-examination by Father's counsel, Mr. Pagan stated that Father has completed housing classes at ARC, and that he supervised ten visits between Father and the Children. *Id.* at 49. On a number of occasions, Father's visits were cancelled because Father was more than fifteen minutes, per the policy of APM. *Id.* at 49-50. The foster parents presented the Children for the visits in accordance with a schedule. *Id.* at 50.

Father testified that he only once told the Children that they would be reunified at the next court date, as that was his impression, and that he has complied with the instruction not to make such promises. *Id.* at 52. Father stated that he travels two and one-half hours by bus for the visits, and that he was late to visits once or twice, missing the fifteen-minute grace period by two minutes both times, because of a fluctuating bus schedule. *Id.* Father stated that on one recent occasion, he had to leave a visit early to make it on time to his parenting group session. *Id.* Father stated that his visits had been canceled five or six times recently, and it was not his fault. *Id.* at 52-53. Father described his visits with the Children as great, with hugs between the Children and him. *Id.* at 53. Father testified that he speaks with the Children about their involvement in sports, plays cards and

board games with them, and takes them to the store to buy food. *Id.* Father stated that the Children fear the response from their foster mother if they interact with him during visits. *Id.*

On October 14, 2015, the trial court involuntarily terminated Father's parental rights to the Children, pursuant 23 Pa.C.S.A. § 2511(a)(1), (2), (8), and (b).

On November 9, 2015, Father timely filed Notices of appeal, along with Concise Statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On December 7, 2015, this Court, acting *sua sponte*, consolidated the appeals.

Father raises the following two questions for this Court's review:

1. Did the [t]rial judge rule in error that [DHS] me[t] its burden of proof that Father's parental rights to [his] children should be terminated[?]

2. Did the trial court rule in error that the termination of Father's parental rights would best serve the needs and welfare of the [C]hildren[?]

Father's Brief at 3.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. ***In re: R.J.T.***, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial

- 13 -

court made an error of law or abused its discretion. ***Id.***; ***R.I.S.***, 6 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. ***Id.***; ***see also Samuel Bassett v. Kia Motors America, Inc.***, 34 A.3d 1, 51 (Pa. 2011); ***Christianson v. Ely***, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. ***Id.***

As we discussed in ***R.J.T.***, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826-27 (Pa. 2012).

The burden is upon the petitioner to prove, by clear and convincing evidence, that the asserted grounds for seeking the termination of parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover,

[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

***Id.*** (quoting ***In re J.L.C.***, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We will focus on subsection 2511(a)(1) and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

* * *

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

Father contends that DHS did not meet its burden of proof, as there was evidence that he was meeting his FSP objectives. Father's Brief at 5.

Father asserts that he did not need alcohol treatment, and that his main impediment was housing, which is an economic issue. *Id.* at 7.

The trial court found as follows with regard to section 2511(a)(1):

It is clear from the record that for a period of six (6) months leading up to the filing of the Petition for Involuntary Termination, [Father] failed to perform parental duties for the [C]hildren. The court found by clear and convincing evidence that [Father] refused or failed to perform his parental duties.

In the instant case[, the CUA] social worker established [SCP] objectives for [F]ather. The SCP objectives for [F]ather were: 1) obtain employment[;] 2) complete parenting classes[;] 3) complete mental health treatment; and 4) obtain appropriate housing. (N.T., 10-14-15, pg[]. 37). The testimony established that [Father] failed to complete all of his SCP objectives. [Father] did not complete his parenting classes. (N.T., 10-14-15, p. 47). Furthermore, [Father] did not complete any mental health treatment. (N.T., 10-14-15, p. 39). Lastly, [Father] did not obtain appropriate housing. He refused to provide the CUA social worker with an address where he resided. (N.T., 10-14-15, p. 39).

A parent has an affirmative obligation to act in his child's best interest. In reference to parental contact, "to be legally significant, the contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship, and must demonstrate a willingness and capacity to undertake the parental role." *In re D.J.S.*, 737 A[.]2d 283, 286 (Pa. Super. 1999) (quoting *In re Adoption of Hamilton*, 379 Pa. Super. 274, 549 A.2d 1291, 1295 (1988)).

In the instant matter, M.S., N.S. and K.S. have been in placement care for more than twenty-four months. The testimony established that the [C]hildren are in a stable environment and that adoption is in the best interest of the [C]hildren. (N.T., pgs. 28-29, and 46). Furthermore, the CUA worker testified that [Father] was inconsistent with his visits with the [C]hildren. (N.T., 10-14-15, pgs. 40-41). [Father] had

supervised visits with the [C]hildren and he never progressed to unsupervised[.]   N.T., 10-14-15, p. 41).

Trial Court Opinion, 1/20/16, at 3-4 (unnumbered).

As the trial court's factual findings are supported by the record, and the court's legal conclusions are not the result of an error of law or an abuse of discretion, we affirm the trial court's determination with regard to subsection (a)(1). *See In re Adoption of S.P.*, 47 A.3d at 826-27.

Next, we review the termination of Father's parental rights under section 2511(b).  This Court has explained that the focus in terminating parental rights under section 2511(a) is on the parent, but, under section 2511(b), the focus is on the child.  *In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*).

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child."  23 Pa.C.S.[A.] § 2511(b).  The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability."  *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012).  In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child.  The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.  *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

We have stated that, in conducting a bonding analysis, the court is not required to use expert testimony, but may rely on the testimony of social workers and caseworkers.  *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super.

- 17 -

2010). This Court has also has observed that no bond worth preserving is formed between a child and a natural parent, where the child has been in foster care for most of the child's life, and the resulting bond with the natural parent is attenuated. *In re K.Z.S.*, 946 A.2d 753, 764 (Pa. Super. 2008). It is appropriate to consider a child's bond with his or her foster parent(s). *See In re: T.S.M.*, 71 A.3d at 268.

In addition, in *In re: T.S.M.*, our Supreme Court set forth the process for evaluation of the existing bonds between a parent and a child, and the necessity for the court to focus on concerns of an unhealthy attachment and the availability of an adoptive home:

> [C]ontradictory considerations exist as to whether termination will benefit the needs and welfare of a child who has a strong but unhealthy bond to his biological parent, especially considering the existence or lack thereof of bonds to a pre-adoptive family. As with dependency determinations, we emphasize that the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. *See, e.g., R.J.T.*, [9 A.3d at 1190] (holding that statutory criteria of whether child has been in care for fifteen of the prior twenty-two months should not be viewed as a "litmus test" but rather as merely one of many factors in considering goal change). Obviously, attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. Similarly, while termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home, termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.

[The Adoption and Safe Families Act of 1997, P.L. 105-89] ASFA[,] was enacted to combat the problem of foster care drift, where children . . . are shuttled from one foster home to another, waiting for their parents to demonstrate their ability to care for the children. **See In re R.J.T.**, 9 A.3d at 1186; **In re Adoption of S.E.G.**, [901 A.2d 1017, 1019 (Pa. 2006)]. This drift was the unfortunate byproduct of the system's focus on reuniting children with their biological parents, even in situations where it was clear that the parents would be unable to parent in any reasonable period of time. Following ASFA, Pennsylvania adopted a dual focus of reunification and adoption, with the goal of finding permanency for children in less than two years, absent compelling reasons. **See**, 42 Pa.C.S. § 6301(b)(1); 42 Pa.C.S. § 6351(f)(9) (requiring courts to determine whether an agency has filed a termination of parental rights petition if the child has been in placement for fifteen of the last twenty-two months).

**In re: T.S.M.**, 71 A.3d at 268-69.

Father asserts that the trial court failed to consider the affectionate, loving bond between the Children and him, and the effect on the Children from severing that bond. Father's Brief at 7. He also asserts that the evidence presented at the hearing indicated that there is a close bond between the Children and him. **Id.**

The trial court addressed Father's claim as follows:

Pursuant to Section 2511(b), the trial court must take in[to] account whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. **In Re C.S.**, 761 A.2d 1197, 1202 (Pa. Super. 2000). In the instant matter, the testimony established the [C]hildren do not always have an appropriate bond with [Father]. (N.T., 10-14-15, p. 15-17).

The testimony of [the] social worker established that all of the [C]hildren have a loving, caring bonded relationship with their foster parents, the paternal aunt and uncle…. (N.T., 10-14-15, pgs. 43-46). Furthermore, the social worker's testimony established that the [C]hildren would not suffer any permanent

- 19 -

emotional or irreparable harm if [Father's] rights were terminated AND that adoption is in the best interest of all of the [C]hildren. (N.T., 10-14-15, pgs. 43-47). Lastly, the therapist testified that the [C]hildren look to the foster parents for stability and love and it "absolutely" would be in the best interest of the [C]hildren to remain with their foster parents. (N.T., 10[-]14-15, pg. 28).

The Trial Court found by clear and convincing evidence that [DHS] met [its] statutory burden pursuant to 23 Pa.C.S.A. § 2511(a) & (b) (N.T., 10-14-15, pg. 59) and that it was in the best interest of the [C]hildren to change the goal to adoption.

Lastly, in the instant matter, the social worker and the therapist testified credibly. (N.T., 10-14-15, pgs. 59-60).

Trial Court Opinion, 1/20/15, at 5 (unnumbered).

The trial court considered the needs and welfare of the Children, and set forth its bond-effect analysis. The trial court also provided an explanation of why its termination decision was not based on economic matters that were outside of Father's control. The trial court properly considered the best interests of the Children in rendering its decision that, although there was evidence of a bond between the Children and Father, it was in their best interests to sever that bond. *See id.*; *In re: T.S.M.*, 71 A.3d at 268-269; *see also In re Z.P.*, 994 A.2d at 1125 (stating that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.") Again, as the trial court's factual findings are supported by the record, and the court's legal conclusions are not the result of an error of law or an abuse of discretion, we affirm the trial court's decision with regard to subsection (b).

*In re Adoption of S.P.*, 47 A.3d at 826-27.  Accordingly, we affirm the trial court's Decrees terminating Father's parental rights.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/8/2016